IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH B. MATTHEWS,

        Plaintiff,                    No. 2:09-cv-2415 GEB KJN P

    vs.

LAHEY, et al.,

        Defendants,             FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

       Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to 42 U.S.C. § 1983. This case is proceeding on the original complaint, filed August 27, 2009. Plaintiff alleges that defendant Dr. Basi was deliberately indifferent to plaintiff's serious medical needs in connection with the diagnosis and treatment of plaintiff's right shoulder, injured on December 26, 2007. Pending before the court is Dr. Basi's motion for summary judgment. As explained below, the court recommends that the motion for summary judgment be granted.

II. Plaintiff's Allegations

       In his verified August 27, 2009 complaint, plaintiff alleges that on December 26, 2007, plaintiff was performing dips in the prison yard and heard two large popping/cracking sounds. Plaintiff immediately began to experience pain in his right shoulder. Plaintiff walked to

1

the emergency clinic where he complained that he was in extreme pain due to a broken right shoulder.  After waiting for two hours, plaintiff was seen by Dr. Basi, who examined plaintiff for about five to ten minutes.  Dr. Basi ordered a clavicle brace for plaintiff, prior to the ordering of an x-ray.  In lieu of a clavicle brace, plaintiff was given an arm sling for a broken arm.  Dr. Basi then ordered an x-ray for plaintiff; plaintiff was x-rayed an hour later.  Dr. Basi held the film up to normal light and told plaintiff that his shoulder was "fine."  Dr. Basi told plaintiff to "lay-in" for six weeks.  For pain, plaintiff was given an injection of Toradol, and prescribed Tylenol #3.  Plaintiff walked back to his housing unit.

III.  Motion for Summary Judgment

Dr. Basi moves for summary judgment on the grounds that there are no genuine issues of material facts and he is entitled to judgment as a matter of law.  Plaintiff filed an opposition, and defendants filed a reply.  (Dkt. Nos. 96, 97.)  On July 24, 2012, plaintiff was advised of the requirements for filing an opposition to a motion for summary judgment under Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998), and granted an additional thirty days in which to file a supplemental opposition.  (Dkt. No. 98.)  On September 11, 2012, plaintiff filed an untimely[1] supplemental opposition.  (Dkt. No. 100.)  Dr. Basi filed a reply on September 19, 2012.  (Dkt. No. 101.)

A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. "  Fed. R. Civ. P. 56(a).[2]

---

[1] Although plaintiff's filing was untimely, the court will consider the supplemental opposition in light of Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

[2] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248


(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By orders filed December 8, 2009, and July 24, 2012, the court advised plaintiff of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. Nos. 19, 98); see Rand, 154 F.3d at 957.

B. <u>Undisputed Facts</u>

For purposes of the instant motion for summary judgment, the court finds the following facts undisputed.

1. Plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at California State Prison in Solano ("CSP-Solano") from 2007 to 2008.

2. Defendant Dr. Amrik Basi is a licensed physician, employed as a family practitioner by the CDCR, from November 2006 to December 2008, rotating through three clinics, seeing inmates for a variety of medical problems. (Dkt. No. 92-3 at 42.)

3. On December 26, 2007, at approximately 8:30 a.m., plaintiff heard three pops in his right shoulder while plaintiff was doing dips in the prison exercise yard. (Dkt. Nos. 1 at 6, ¶ 13; 56 at 9, 12; 92-3 at 42.) Plaintiff walked to the medical annex. (Dkt. No. 56 at 11-12.)

4. Plaintiff was seen by a nurse at 8:45 a.m. on December 26, 2007. (Dkt. No. 56 at 16, 18.)

5. Plaintiff told the nurse that he heard two cracks while doing dips, and plaintiff complained of pain in his right shoulder, collar bone, and neck areas, and reported he was unable to lift his right arm due to pain in his shoulder. (Dkt. Nos. 55-10 at 2; 92-3 at 42.)

6. Dr. Basi treated plaintiff on December 26, 2007. (Dkt. No. 92-3 at 42.)

7. At approximately 9:15 a.m., on December 26, 2007, Dr. Basi ordered x-rays of plaintiff's right clavicle and right shoulder. (Dkt. Nos. 56 at 18; 55-10 at 2.)

8. At approximately 9:15 a.m., on December 26, 2007, Dr. Basi prescribed 60 mg Toradol intramuscularly for control of plaintiff's pain. (Dkt. Nos. 56 at 14-15; 18; 55-3 at 2; 92-3 at 42.)

9. Plaintiff was taken to the Correctional Treatment Center to have x-rays taken, and to receive the Toradol injection. (Dkt. No. 56 at 16 & 17.)

10. At approximately 9:50 a.m., on December 26, 2007, plaintiff received an

5

injection of Toradol for pain management.  (Dkt. No. 56 at 14, 18.)

11. X-rays of plaintiff's right clavicle and right shoulder were taken on December 26, 2007.  (Dkt. No. 56 at 15.)

12. After plaintiff received the Toradol injection and the x-rays were taken, plaintiff returned to the medical annex.  (Dkt. No. 56 at 17, 19.)

13. Plaintiff was seen again by Dr. Basi at approximately 12:35 p.m., on December 26, 2007.  (Dkt. No. 56 at 19.)

14. At approximately 12:35 p.m., on December 26, 2007, plaintiff was provided the following treatment:

   a. Two Tylenol #3 (Tylenol with codeine) for pain management;

   b. Prescribed one or two Tylenol #3 to be taken two times per day;

   c. Issued chronos for a lower bunk, a clavicle brace, and an arm sling; and a "no-get-down" chrono to accommodate plaintiff's physical limitations;

   d. Plaintiff was given an arm sling in lieu of a clavicle brace because a clavicle brace was not available; and

   e. Plaintiff was placed on "lay-in" for twenty-nine days.

(Dkt. No. 92-3 at 49.)  The "lay-in" excused plaintiff from going to chow and the yard, and provided that food would be brought to him.  (Dkt. No. 92-3 at 42.)

15. Dr. Basi told plaintiff to return to the clinic in two weeks.  (Id. at 42, 50.)

16. Dr. Traquina confirmed that an "arm sling provides similar immobilization as a clavicle brace."  (Dkt. No. 14-1 at 2.)

17. The x-rays of plaintiff's right shoulder taken on December 26, 2007, showed neither significant abnormality nor evidence of instability.  (Dkt. No. 14-1 at 2, 10.)[3]

---

[3] The Radiology Report sets forth the following findings:  "Multiple films of the clavicle and shoulder were obtained.  Films of the AC joint were taken with weights in the hands and

6

18. Dr. Basi declares that after reviewing the x-rays, his impression was that plaintiff had a right clavicle fracture. (Dkt. No. 92-3 at 42.) "Plaintiff had full range of motion in all digits on his right hand and was neurovascularly intact." (Id.)

19. Plaintiff had no other involvement with Dr. Basi after plaintiff's visit to the medical annex on December 26, 2007. (Dkt. No. 92-3 at 43.)

20. In Dr. Basi's medical opinion, the treatment provided to plaintiff on December 26, 2007, was "medically appropriate and within the applicable standard of care." (Dkt. No. 92-3 at 43.)

21. On May 17, 2008, plaintiff was seen by Dr. John N. Diana, an orthopedist, who examined plaintiff and reviewed the December 26, 2007 x-rays. (Dkt. Nos. 55-5 at 23; 92-3 at 43.) Dr. Diana disagreed with the radiologist's impression, and noted a clavicular fracture on the medial shaft which was evident on more than one view. (Id.) Dr. Diana found the fracture was nondisplaced, the AC joint was appropriately aligned, with mild degenerative changes, and perhaps slight widening between the distal clavicle and the acromion. (Id.)

22. Dr. Diana requested x-rays and a CT scan of plaintiff's right shoulder to rule out nonunion of the clavicle fracture. (Dkt. No. 92-3 at 43; see also Dkt. Nos. 55-5 at 3, 19-24.)

23. The May 17, 2008 orthopedic consultation report reflects Dr. Diana discussed operative and nonoperative treatment options with plaintiff, and noted that if there was a nonunion, an open reduction and internal fixation and bone grafting would be considered. Nonoperative treatment included activity modification and occasional anti-inflammatory medications. (Dkt. Nos. 55-5 at 23; 92-3 at 43.)

24. The x-rays taken on May 17, 2008, at Queen of the Valley Hospital, showed a subacute fracture of the proximal right clavicle, with underriding displacement of the distal

---

without weights. No significant abnormality is seen. The glenohumeral relationships are normal. The acromioclavicular relationship is normal. No evidence of instability is seen." (Dkt. No. 14-1 at 10.)

fragment, and callus formation within complete union. (Dkt. No. 92-3 at 43, 57.)

25. On September 11, 2008, plaintiff presented complaining of "a lot of pain," and "limitation of activities." (Dkt. No. 92-3 at 51.) Plaintiff's right clavicle fracture was confirmed based on the May 17, 2008 x-ray. Upon examination, it was noted that plaintiff had nearly full range of motion. An urgent CT scan was ordered, and plaintiff was advised to avoid any use of his right arm that causes pain. (Id.)

26. A CT scan was done on September 26, 2008, which showed (1) an old, healed, remodeled, slightly overlapping fracture of the mid proximal clavicle, and (2) no CT abnormality overlying the distal end of the clavicle. (Dkt. No. 92-3 at 54.)

27. On October 16, 2008, a referral for follow-up consultation was ordered. (Dkt. Nos. 55-5 at 26; 14-1 at 2.)

28. On February 21, 2009, plaintiff was again seen by Dr. John N. Diana. (Dkt. No. 55-14 at 7-8.) Dr. Diana's clinical impression was a "healed medial clavicular fracture." (Dkt. No. 55-14 at 8.) Dr. Diana set forth the following plan for plaintiff:

> Overall [plaintiff] is doing quite well. He has no pain at the fracture site now. His nonspecific symptoms in the arm are very mild and only occasionally occur. Perhaps this is related to a stretch injury that might have occurred at the time, but no focal deficits are identified on exam today. So, I would not work this up further unless it worsened. Otherwise, [plaintiff] can increase activity as tolerated. Followup as needed in the future.

(Id.)

29. On May 8, 2009, at a follow-up appointment, plaintiff's right clavicle appeared non-tender and his range of motion was normal. (Dkt. No. 92-3 at 44, 56.) Plaintiff noted that he has occasional pain in his right clavicle, but had no limitations of his activities. (Id.) Plaintiff was advised to increase activities as tolerated. (Id.)

30. Based upon his review of the medical records, and his education, training and experience, Dr. Basi opines that there is no indication for future surgical intervention for the clavicle fracture plaintiff sustained on December 26, 2007. (Dkt. No. 92-3 at 44.)

C. <u>Eighth Amendment Legal Standard</u>

Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). According to <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 6 (1992)), <u>overruled on other grounds by</u> <u>WMX Technologies, Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997). Specifically, a determination of "deliberate indifference" involves two elements:  (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs. <u>McGuckin</u>, 974 F.2d at 1059.

First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 104). Examples of instances where a prisoner has a "serious" need for medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. <u>McGuckin</u>, 974 F.2d at 1059-60 (citing <u>Wood v. Housewright</u>, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established. <u>McGuckin</u>, 974 F.2d at 1060. Deliberate

9

indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison physicians provide medical care." Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate indifference to be established, there must first be a purposeful act or failure to act on the part of the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

In order to defeat defendants' motion for summary judgment, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

### D.  Analysis

The parties do not appear to dispute that a broken clavicle demonstrates a serious medical need.  It is also undisputed that plaintiff first saw Dr. Basi on December 26, 2007, the date plaintiff sustained the fracture, and that Dr. Basi did not treat plaintiff again for the fractured clavicle.

In his first unverified opposition, plaintiff alleges that Dr. Basi was deliberately indifferent to plaintiff's serious medical needs by allegedly failing to treat plaintiff's broken clavicle, and intentionally delaying treatment for the fracture. (Dkt. No. 96 at 5.) Plaintiff claims that because plaintiff was forced to wait months for treatment for his broken clavicle, he was caused unnecessary pain and suffering because the fracture healed incorrectly. (Id. at 7.) While not entirely clear, it appears plaintiff also argues that to save money, Dr. Basi did not order surgery to fix the fracture, but opted to give plaintiff pain medication instead, and that because plaintiff did not receive the clavicle brace, plaintiff's clavicle failed to heal properly. (Id. at 8.)

After receiving the Rand notice, plaintiff again provided an unverified, supplemental opposition, and did not provide a declaration. Plaintiff states that Dr. Basi "willfully failed to provide medical treatment for a clavicle fracture." (Dkt. No. 100 at 4.) Plaintiff sets forth the treatment provided by Dr. Basi, but claims that Dr. Basi "intentionally failed to request to have [plaintiff's] shoulder set or order surgery done." (Id.)

In support of this claim, plaintiff directs the court to the "Notification of Diagnostic Test Results," on form CDCR 7393, dated February 5, 2008, and signed by Dr. Basi. In this document, Dr. Basi addressed the test of plaintiff's right shoulder, taken December 26, 2007, and checked the box that states: "Your test results are essentially within normal limits or are unchanged and no physician follow up is required." (Dkt. No. 100 at 36.) Plaintiff states that in discovery responses, Dr. Basi confirmed that the signature on the form CDCR 7393 was his signature, and that Dr. Basi checked the box noted. (Dkt. No. 100 at 5.)

However, plaintiff fails to demonstrate how Dr. Basi's response on the form 7393 constitutes deliberate indifference. First, it is undisputed that the x-rays of plaintiff's right shoulder taken on December 26, 2007, showed neither significant abnormality nor evidence of instability. Thus, the documentary evidence supports Dr. Basi's notation on the CDCR 7393 form. Second, even if the form was incorrectly marked, plaintiff fails to demonstrate how such an error constitutes deliberate indifference on the part of Dr. Basi. Third, despite the

11

radiologist's report, Dr. Basi treated plaintiff for a broken clavicle.  Plaintiff concedes that Dr. Basi ordered a shot of Toradol for pain and xrays of the shoulder, prescribed Tylenol #3 for pain management, issued chronos for a lower bunk, a clavicle brace, and an arm sling; and a "no-get-down" chrono to accommodate plaintiff's physical limitations; and placed him on "lay-in" for twenty-nine days.  It is also undisputed that Dr. Basi told plaintiff to return to the clinic in two weeks.  Dr. Basi opines that the treatment provided to plaintiff on December 26, 2007, was medically appropriate and meets the standard of care for family practice physicians practicing in California in 2007 and 2008.  Plaintiff failed to rebut this expert opinion with competent evidence.  Also, plaintiff failed to adduce evidence that Dr. Basi knew, or should have known, on the very date plaintiff sustained the fracture, that plaintiff's clavicle would not heal properly.

Plaintiff now argues that he should have been provided surgery for the fractured clavicle on December 26, 2007, or that his shoulder should have been "set" on December 26, 2007.  However, plaintiff provided no medical evidence or expert opinion to suggest that surgery was required on December 26, 2007, or that the standard of care for treating a broken clavicle involved "setting" the shoulder.

On the other hand, it is undisputed that on May 17, 2008, Dr. Diana, an orthopedist, disagreed with the radiologist's impression of the December 26, 2007 x-rays, and diagnosed a clavicle fracture, but Dr. Diana did not order that plaintiff be provided surgery.  Rather, Dr. Diana discussed with plaintiff his operative and nonoperative options, and ordered additional x-rays and a CT scan, to determine whether there was a nonunion that might require surgery.  If the tests revealed a nonunion, then the doctor would consider an open reduction, internal fixation, and bone grafting.  Plaintiff also failed to rebut this evidence.  Moreover, the additional tests did not reveal a nonunion of the fracture, and Dr. Diana's clinical impression was a "healed medial clavicular fracture."  Dr. Diana did not find that plaintiff's healed fracture required surgery or further treatment.  Thus, plaintiff failed to rebut the medical evidence demonstrating that no surgery was required.

1  Plaintiff also argues that had he been provided a clavicle brace, his fracture would
2  have healed properly, sparing him additional months of pain.  However, plaintiff provides no
3  evidence or expert opinion supporting this theory.  Defendant Dr. Traquina confirmed that an
4  "arm sling provides similar immobilization as a clavicle brace."  (Dkt. No. 14-1 at 2.)  Plaintiff
5  provided no evidence to rebut Dr. Traquina's opinion.  Moreover, evidence was adduced in the
6  prior motion for summary judgment that plaintiff was not wearing the sling.  In administrative
7  appeals, Dr. Traquina noted that "[r]ecords also indicate that [plaintiff is] not wearing the sling
8  that was provided. . . ."  (Dkt. No. 55-4 at 3.)  Thus, plaintiff failed to demonstrate that the failure
9  of Dr. Basi to provide plaintiff with a clavicle brace on December 26, 2007, caused plaintiff's
10  clavicle bone to heal improperly.
11  With his unverified oppositions, plaintiff provided a number of additional
12  exhibits, many of which are dated after Dr. Basi treated plaintiff on December 26, 2007.  Plaintiff
13  failed to demonstrate how those exhibits supported his claim that Dr. Basi was deliberately
14  indifferent to plaintiff's serious medical needs on December 26, 2007.
15  In his deposition, plaintiff contended that when Dr. Basi received the x-rays, he
16  held them up in the air and said plaintiff was "fine."  (Dkt. No. 56 at 19.)  Plaintiff complained
17  that Dr. Basi performed a "cursory" examination, and could not properly view the x-ray by
18  holding it up to the room light.  (Id. at 42.)  Plaintiff claimed that Dr. Basi should have given
19  plaintiff pain medication sooner because plaintiff was in extreme pain for hours.  (Id. at 42-43.)
20  Plaintiff's claim that defendant Basi prolonged plaintiff's pain, in violation of the
21  Eighth Amendment, is unavailing.  The undisputed facts reflect that plaintiff was injured around
22  8:30 a.m., was seen by a doctor at 9:15 a.m., and was administered Toradol by injection at
23  approximately 9:50 a.m.  This represents an hour and a half delay in receiving pain medication.
24  Plaintiff has adduced no evidence to demonstrate that he should have been provided pain
25  medication immediately upon arrival at the medical annex, prior to diagnosis by a medical
26  professional, or immediately upon diagnosis by a medical professional.  The Ninth Circuit has

found that a delay of several days in receiving pain medication for a broken shoulder did not amount to an Eighth Amendment violation. Wood v. Housewright, 900 F.2d at 1333-35. Therefore, even if plaintiff was provided pain medication two or three hours after he was first injured, the delay would not constitute an Eighth Amendment violation.

Plaintiff makes much of Dr. Basi's alleged statement that plaintiff was "fine." In his verified complaint, plaintiff stated that Dr. Basi told plaintiff that his "shoulder was fine." (Dkt. No. 1 at 7) (emphasis added). In his deposition, plaintiff claimed that Dr. Basi said plaintiff "was fine." (Dkt. No. 56 at 19.) However, even if Dr. Basi made such a statement, the record evidence demonstrates that Dr. Basi appropriately treated plaintiff for the fractured clavicle. Plaintiff did not rebut this evidence. Thus, whether or not Dr. Basi examined plaintiff long enough to suit plaintiff, or reviewed the x-rays in normal light rather than in a lighted view box, the undisputed evidence reflects plaintiff received appropriate care for a broken clavicle.

To the extent that plaintiff argues that the fracture is not resolved and is permanently deformed, as evidenced by the September 26, 2008 CT scan showing the fracture was remodeled and slightly overlapping, his claim is unavailing. The CT scan also reflected that the fracture was healed, and Dr. Diana also found that the fracture was healed on February 21, 2009. Dr. Basi noted that the CT scan showed that the fracture was healed, with about 1.2 centimeters of overlap. (Dkt. No. 92-3 at 44.) In Dr. Basi's medical opinion, "it is common for fractures to heal with a mild overlap and does not indicate any severe abnormality, as long as the range of motion of the shoulder is near normal." (Id.) The undisputed evidence demonstrates plaintiff's range of motion was normal. Plaintiff did not rebut Dr. Basi's opinion with competent evidence.

Thus, plaintiff fails to demonstrate how Dr. Basi's actions demonstrate deliberate indifference. The undisputed evidence shows that Dr. Basi examined plaintiff, ordered pain medication and x-rays, and ordered chronos for a lower bunk, a "no-get-down," and a 29 day "lay-in." The undisputed evidence reflects Dr. Basi treated plaintiff appropriately, and took steps

to ensure plaintiff received pain medication, a sling in lieu of a clavicle brace, and appropriate chronos to ensure plaintiff's activities were limited.  Plaintiff failed to support, with competent evidence, his claim that he required surgery on December 26, 2007, or that the delayed healing of the clavicle fracture was the result of not receiving a clavicle brace.  Therefore, Dr. Basi is entitled to summary judgment.

IV.  Qualified Immunity

Although Dr. Basi stated he was entitled to qualified immunity in the notice accompanying the motion (dkt. no. 92 at 1), Dr. Basi did not argue qualified immunity in his points and authorities, and the reply makes clear that he did not intend to include such an argument.  In any event, because the court found plaintiff's constitutional rights were not violated, the court need not address the issue of qualified immunity.

V.  Recommendations

Accordingly, IT IS HEREBY RECOMMENDED that the June 11, 2012 motion for summary judgment (dkt no. 92) be granted, and Dr. Basi be dismissed from this case with prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 19, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

matt2415.msj2